(Not for publication)                                    (Docket Entry Nos. 9, 10)

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

_____
                                                    :
BARBARA LYON,                                       :
                                                    :
                              Plaintiff,            :        Civil No. 05-3201 (RBK)
                                                    :
             v.                                     :        **OPINION**
                                                    :
KIMBERLY CLARK CORPORATION                          :
PENSION PLAN,                                       :
                                                    :
                              Defendant.            :
                                                    :
_____:

**KUGLER**, United States District Judge:

       This matter comes before the Court upon cross-motions for summary judgment filed by

Plaintiff Barbara Lyon and Defendant Kimberly Clark Corporation Pension Plan.  For the

following reasons, the Court will deny Defendant's motion for summary judgment and will grant

Plaintiff's motion for summary judgment on her claim for "total and permanent disability

retirement" benefits.

## I.  BACKGROUND

       Plaintiff Barbara Lyon ("Lyon") started working for the Kimberly-Clark Corporation

("Kimberly-Clark") in June 1972 as a Process Engineer in its Neenah, Wisconsin facility. (Rec.

KCC0039.)[1]  In 1997, Lyon transferred to Kimberly-Clark's location in Chester, Pennsylvania,

_____

       [1]The Defendant attached to its motion papers a complete copy of the Administrative
Record as it existed on December 11, 2003.  The citations in this Opinion to "Rec." are citations

1

where she also worked as a Process Engineer. (Id.)  In that position, Lyon was required to walk, climb stairs, sit, and perform frequent lifting.  (See Rec. KCC0036.)

      Sometime in the fall of October 1999, Lyon began experiencing lower back pain. (Rec. KCC0114.) Shortly thereafter, on November 11, 1999, Lyon took a leave of absence from work due to chronic back pain. (Id.) She then applied for and received disability benefits from Kimberly-Clark for the time period from November 11, 1999 through May 10, 2000. (Id.)  In turn, from May 10, 2000 through April 22, 2002 Lyon received long-term disability benefits through Kimberly-Clark Corporation's Long-Term Disability Plan. (Id.) In her motion papers, Lyon alleges that she continues to receive those long-term disability benefits "to date." (Pl. Mem. at 13.)  However, on or about February 28, 2002, Lyon applied for Total and Permanent Disability Retirement ("T&PD") through the Kimberly-Clark Corporation Pension Plan ("the Pension Plan").  (Rec. KCC0116.)  Since November 11, 1999, Lyon has not returned to work.

**A.  The Pension Plan and the Total & Permanent Disability Claims Process**

      The Pension Plan provides disability retirement income to eligible Kimberly-Clark employees. (Rec. KCC0146, § 2.5.)  Moreover, by its terms, the Pension Plan outlines how the Pension Plan is structured and controlled. The assets of the Pension Plan are held in trust by a Trustee.  The Trustee is authorized to use the assets in accordance with the terms of the Pension Plan, which means that the Trustee may use the assets to determine eligibility, provide benefits, and pay the expenses of the Pension Plan. (Rec. KCC0165, § 6.5.)  Kimberly-Clark and its subsidiaries make contributions to the trust; however, Kimberly-Clark has no control over the

_____

to the Bates numbered pages of the Administrative Record as they appear in Defendant's Exhibit A.

assets of the Pension Plan.  Specifically, the Pension Plan provides that Kimberly-Clark has "no beneficial interest of any nature whatsoever in any contributions after such contributions have been received by the Trustee, or in the assets, income or profits of the Trust, or any part thereof." (See Rec. KCC0172, § 9.2.)  Furthermore, no part of the assets of the Trust may be returned to Kimberly-Clark unless the Pension Plan is terminated and all liabilities under the Pension Plan have been satisfied. (Rec. KCC0171, § 8.6.)

To be eligible for disability retirement benefits under the Pension Plan, an employee must demonstrate that he or she has (1) completed five years of vesting service, and (2) terminated employment with Kimberly Clark due to becoming totally and permanently disabled. (Rec. KCC0094-95, § 2.5.)  The Pension Plan defines "total and permanent disability" as "[a] condition arising out of injury or disease which the Committee determines is permanent and prevents an Employee from engaging in any occupation with his Employer commensurate with his education, training and experience. . . ." (Rec. KCC0181, § 10.1(w).)

Under the terms of the Pension Plan, a group of at least three appointed Kimberly Clark employees, officers or directors shall constitute the Retirement Committee ("the Committee"). (Rec. KCC0165, § 6.1.)  The Committee has the sole discretion to determine whether a participant satisfies the eligibility requirements for T&PD benefits. (Rec. KCC0165, §§ 6.2, 6.4.) In particular, the Pension Plan provides in relevant part:

> The Committee shall have all such powers as may be necessary to discharge its duties which are as follows: to construe or interpret the Plan, to determine all questions of eligibility, to compute the amount and determine the method of payment of any Benefits and to perform such other duties as are delegated to it under the Plan or Trust or as may from time to time be delegated to it by the Retirement Trust Committee . . . . The Committee shall exercise the powers granted to it under the Plan in its sole discretion. . . . All rules and decision of the

3

> Committee shall be uniformly and consistently applied to all Employees and
> Pensioners under this Plan in similar circumstances and shall be conclusive and
> binding upon all persons affected by them.

(Rec. KCC0165, §§ 6.2, 6.4.)   However, the members of the Committee do not receive any

compensation for their services. (Rec. KCC0165, § 6.1.)

      With respect to claims for T&PD benefits, the Committee provides a claimant with the

opportunity to present any information that the claimant believes would support his or her claim.

(See Rec. KCC0030, 110.)  When analyzing the documentation provided by a T&PD claimant,

the Committee focuses on whether such documentation supports a determination that the

claimant meets the Pension Plan's definition of "totally and permanently disabled." (See Rec.

KCC0002, 030, 110.)  To aid in this determination, the Pension Plan contracts with Aetna U.S.

Healthcare ("Aetna") to have Aetna (1) perform an independent review of the claimant's T&PD

benefits application and (2) recommend whether the claimant's condition satisfies the Pension

Plan's definition of total and permanent disability. (See Rec. KCC003-38; KCCC0114-115.)

Aetna's recommendation is considered by the Committee as part of the entirety of medical

evidence before it.

      If a claimant's initial application for T&PD benefits is denied, the claimant has the

opportunity to appeal that denial and can submit any additional information that he or she would

like the Committee to consider during the appeal. (Rec. KCC0166, § 6.8.)  The Committee will

then evaluate the merits of the appeal on the basis of all of the medical evidence provided by the

claimant, including any new information submitted as part of the appeal. (Id.)

**C.  Lyon's Initial Application for Total and Permanent Disability Benefits**

      In February 2002, Lyon first applied for T&PD benefits. (Rec. KCC0116.).  In support of

this application, Lyon submitted a Physician's Statement of Disability completed by Dr. Kenneth Rogers on March 20, 2002. (Rec. KCC0117-141.)  In addition, Aetna provided the Committee with a written summary and recommendation on Lyon's claim after it reviewed the medical documentation in Lyon's file. (Rec. KCC0114-115.)

In his Statement of Disability, Dr. Rogers addressed many of Lyon's impairments.  He indicated that Lyon could only sit, stand, walk, and/or drive for less than thirty minutes consecutively. (Rec. KCC0117.)  He also noted that she was taking "long-acting opiates" to control her pain and that she had to "use a cane to ambulate." (Id.)  Moreover, he determined that Lyon was restricted from performing tasks requiring repetitive grasping, pushing/pulling, and fine manipulation, and she was likewise frequently restricted in her ability to kneel, climb, twist, and lift, and occasionally limited in her ability to bend and reach. (Rec. KCC0118.)  Overall, Dr. Rogers opined that Lyon's physical impairments were severe and permanent, such that Lyon was incapable of minimal, sedentary activity, even with job modifications. (Rec. KCC 0118-19.) However, Dr. Rogers also indicated that Lyon was a candidate for rehabilitation as she was scheduled to undergo both cervical and lumbar surgery in the near future. (Rec. KCC0119.)

Similarly, the review submitted by Aetna noted that Lyon had not yet met her "maximum medical improvement" because further surgeries were scheduled. (Rec. KCC0115.)  In other words, in light of the future surgeries and the potential for those procedures to lead to some rehabilitation, Aetna concluded that it was not clear that Lyon was permanently disabled. Accordingly, Aetna recommended that Lyon's claim for T&PD benefits be denied. (Id.)

In turn, the Committee denied Lyon's initial claim for T&PD benefits and advised her of the denial in a letter dated June 24, 2002. (Rec. KCC0032.)  In the decision of denial, the

Committee reiterated some of Dr. Rogers' findings.  However, the Committee explained to Lyon that:

> Your claim for a Disability Benefit is based primarily on chronic back pain, which prevents you from performing your job as a machine operator.  However, the medical documentation that was reviewed by the Committee is insufficient to indicate that you are "Totally and Permanently Disabled," as defined in the Plan . . . . Since you are scheduled for future treatment of your condition, you are not at maximum medical improvement at this time.  Therefore, the permanency of your condition cannot yet be determined.  Based on the information provided to the Committee, the Committee has insufficient information to determine whether your condition is permanent *and* prevents you from engaging in *any* occupation or performing any work for any kind of compensation or financial value. Accordingly, the Committee did not find sufficient evidence to indicate that your condition meets the definition of Total and Permanent Disability, as defined by the Plan.

(Id.) (emphasis in original).  In that same letter, the Committee advised Lyon that she could appeal the decision, and that in support of her appeal, she could submit additional medical documentation to substantiate her claim for T&PD benefits. (Rec. KCC 0033.)  The Committee also informed Lyon that any additional medical evidence "must be sufficient to indicate your condition is permanent and prevents you from engaging in any occupation with Kimberly Clark commensurate with your education, training and experience" as provided in the definition of total and permanent disability in the Pension Plan. (Id.)

### D.  Lyon's Appeal of the Committee's Initial Determination

On September 11, 2002, Lyon sent the Committee a letter appealing the Committee's June 24, 2002 denial.  (Rec. KCC0039-40.)  Lyon reported that since beginning disability leave in November 1999, she had undergone three surgical procedures: (1) a total hip replacement in October 2000; (2) arthroscopy on her left shoulder in January 2002; and (3) double anterior lumbar fusion in June 2002. (Rec. KCC0039-040.)  Moreover, in support of her appeal, Lyon

6

submitted the following new evidence: (1) results of six MRIs (Rec. KCC0041-050, 086); (2)

results of 2 CT scans (Rec. KCC0051, 053-054, 087-89); (3) a lumbar spine x-ray (Rec.

KCC0052); (4) a decision from the Social Security Administration finding Lyon to be disabled

(Rec. KCC0055-067); (5) a Physician Statement of Disability prepared by Dr. Mark Testaiuti

(Rec. KCC0068-081); (6) a Medical Report prepared by Dr. Mark Testaiuti (Rec. KCC 0082-

083); (7) an Operative Report prepared by Dr. Kenneth Rogers (Rec. KCC 0084-85); (7) a

Physician Statement of Disability prepared by Dr. Ann Miller (Rec. KCC0090-102); (8) an

Operative Report prepared by Dr. Rosen (Rec. KCC 0103-105); and (9) a Consultation Report

prepared by Dr. Williams (Rec. KCC 0106-108).

     In the Physician's Statement of Disability dated August 8, 2002, Dr. Testaiuti noted some

of Lyon's physical restrictions.  For instance, he determined that she could only sit, stand, walk,

or drive for a maximum of thirty minutes. (Rec. KCC0069.)  He also noted that she used a cane

to ambulate and her impairments restricted her from bending, kneeling, climbing, twisting, and

lifting. (See Pl. Exhibit N.)[2]  In addition, he noted that she was restricted from using her feet for

repetitive movements. (Id.)  Overall, Dr. Testaiuti found that Lyon's physical capacity was

severely and permanently limited such that she was incapable of performing minimal activity and

would not be able to work even with job modifications. (Id.) He also noted that she was a

candidate for rehabilitation. (Id.)

     In a Physician's Statement of Disability dated July 31, 2002, Dr. Ann Miller reported

similar limitations on Lyon's physical capacity.  She found that Lyon could only sit, stand, walk,

---

[2] There appears to be a page missing from Dr. Testaiuti's statement of disability in the copy attached to Defendant's motion at Exhibit A.

or bend for less than thirty minutes consecutively as she required a cane to ambulate and took long-acting opiates to control pain. (Rec. KCC0090.) She also noted that Lyon was restricted from using her hands and feet for repetitive tasks and that Lyon should not perform any bending, kneeling, climbing, twisting, or lifting. (See Pl. Exh. O.)[3]  Ultimately, like Dr. Testaiuti and Dr. Rogers, Dr. Miller concluded that Lyon was severely and permanently impaired such that she was incapable of performing minimal, sedentary activity and would not be able to work even with job modifications. However, Dr. Miller likewise indicated that Lyon was a candidate for rehabilitation. (Id.)

In addition, Aetna reviewed the medical record and completed a new report and recommendation on Lyon's claim on appeal for T&PD benefits. (See Rec. KCC0036-38.) Again, Aetna recommended that the Committee deny Lyon's claim for T&PD pension benefits.  Aetna provided the following additional reasons to support its position: (1) Lyon was undergoing active treatment for her intermittent lower back pain and was scheduled for additional surgery, and thus, had not met her maximum medical improvement; (2) Lyon's statements regarding her feet, hand and elbow arthritis were unsupported by clinical evidence in the record; (3) Lyon's leg muscle tone and bulk were normal without atrophy; (4) objective clinical information was absent from Lyon's file and precluded a determination as to the degree of impairment related to her carpal tunnel syndrome diagnosis; and (5) Lyon was a candidate for rehabilitation. (Id.)

In light of the medical evidence before it, the Committee again concluded that Lyon had not shown that she was totally and permanently disabled according to the terms of the Pension

---

[3]There also appears to be a page missing from Dr. Miller's statement of disability in the copy attached to Defendant's motion at Exhibit A.

Plan. (Rec. KCC0030-031.)  In the January 15, 2003 letter denying Lyon's appeal, the Committee explained that not enough time had passed since her June 2002 lumbar surgery to "determine [her] rehabilitation potential and to determine [her] physical capabilities after reaching maximum medical improvement." (Rec. KCC0031.)  The Committee also recognized that although Dr. Testaiuti and Dr. Miller concluded that Lyon was permanently disabled, they both also determined that she was a candidate for rehabilitation. (Id.)  Therefore, although the Pension Plan only expressly allows for one appeal of a denied claim for T&PD benefits, the Committee advised Lyon that she could reapply for benefits once she reached maximum medical improvement.[4]  (Id.)  The Committee also advised that if she chose to do so, it would be helpful if she submitted a Functional Capacity Evaluation ("FCE"). (Id.)

Furthermore, the Committee explained why the Social Security Administration's ("SSA") finding of a disability did not automatically translate into the Committee granting T&PD benefits.  The Committee noted that although it takes SSA determinations into consideration, the Committee is granted sole discretion to make a determination of total and permanent disability

---

[4]Similarly, in its reply papers, the Defendant reiterates the fact that the denial of Lyon's initial application for T&PD benefits would not prevent her from subsequently applying for and receiving T&PD benefits, if her condition worsened in the future.  Specifically, the Defendant commented:

> It should be noted that the denial of the current application does not preclude Plaintiff from submitting a new claim for Total and Permanent Disability Benefits with the Committee.  If, in the future, her condition rises to the level of a total and permanent disability, as defined under the plan, and she is prevented from engaging in any occupation with Kimberly-Clark commensurate with her education, training and experience, Plaintiff may be entitled to T&PD pension benefits.

(Def. Reply at 4 n.4.)

9

under the terms of the Pension Plan. (Id.)  Moreover, the Committee also explained that the SSA uses a different standard to determine disability status.  The SSA only requires a showing that an individual's disability is expected to last for at least 12 months, whereas the Pension Plan requires the disability to be total and permanent. (Id.)  Additionally, the Committee recognized that the SSA hearing took place before Lyon had her lumbar surgery. (Id.)  In other words, in the letter denying Lyon's appeal, the Committee provided reasons why it did not follow the SSA's determination as to Lyon's disability status.

### E.  The Committee's Special Review and Final Denial of Benefits

On November 14, 2003, Lyon submitted a letter, through her counsel, to the Committee requesting reconsideration of her claim for T&PD pension benefits. (Rec. KCC0006-008.) Along with this request, Lyon submitted the following additional documentation: (1) a medical report prepared by Dr. Miller (Rec. KCC0020-021); (2) notes prepared by Dr. Testaiuti (Rec. KCC0018-019); (3) a medical report prepared by Dr. Ralph G. Cataldo (Rec. KCC0009-017); (4) a hand drawn diagram of Lyon's former work area at Kimberly-Clark (Rec. KCC0022-023); and (5) a statement by Lyon describing her former job duties (Rec. KCC0024-28.).

The new medical evidence submitted by Lyon addressed the issue of whether she had achieved the point of maximum medical improvement.  In the new medical report completed by Dr. Testaiuti on October 1, 2003, he concluded that Lyon "would not require any further surgery" and he felt "she has reached maximum medical improvement." (Rec. KCC0018-19.)  Dr. Miller's report dated November 11, 2003, by contrast, noted that "further surgeries are probable in the future." (Rec. KCC0020.)  However, she also concluded that "even with possible rehab" Lyons would not be able to work "even a part-time job on a regular basis." (Rec. KCC0021.)

Moreover, Dr. Cataldo noted in his report dated September 8, 2003 that, in his opinion, Lyons

was "totally and permanently disabled." (Rec. KCC0017.)

       After reviewing the newly submitted evidence, the Committee once again denied Lyon's

request for T&PD pension benefits in a letter dated December 11, 2003.  It appears that the

Committee had two reasons for issuing its denial.  First, the Committee stated that "the medical

records do not include objective evidence of neurologic compromise, such as EMG or nerve

conduction studies." (Rec. KCC0002.)  According to the letter of denial, Kimberly Clark's

Medical Director spoke with Dr. Miller on the issue, and she could not recall whether any such

tests were performed. (Id.)  Similarly, the Committee noted that the Medical Director spoke with

Dr. Cataldo, who allegedly reported that he had no knowledge of EMG/NCS results or any other

objective functional studies, even though he mentioned an EMG in his report. (Id.)  Second, the

Committee noted that no FCE had ever been performed or submitted on Lyon's behalf. (Id.)  The

Committee apparently placed calls to Dr. Rogers and Dr. Testaiuti on the issue, but neither could

be reached. (Id.)  Ultimately, the Committee summarized its final decision as follows:

> Although Ms. Lyon has significant osteoarthritis of the spine and multiple joints,
> has undergone several major orthopedic surgeries, walks with a cane, and has
> persistent chronic pain that is being treated by a pain specialist with narcotic
> analgesics, there is no evidence of neurological deficits with regard to Ms. Lyon's
> back pain, and no functional capacity evaluation.  Based on all the information
> presented to the Committee, the Committee was unable to determine that the
> termination of Ms. Lyon's employment was because of her having become Totally
> and Permanently Disabled, nor that her condition is permanent and prevents her
> from engaging in any occupation with Kimberly-Clark commensurate with her
> education, training, and experience.

(Rec. KCC0002-03.)  Therefore, the Committee denied Lyon's claim for T&PD pension benefits.

       Thereafter, on June 24, 2005, Lyons initiated the above-captioned action against the

11

Defendant seeking a reversal of the Committee's decision on her claim for T&PD benefits.  Both parties then filed the present motions for summary judgment on February 1, 2006.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986).  A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could find for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The burden of establishing the nonexistence of a "genuine issue" is on the party moving for summary judgment. Celotex, 477 U.S. at 330. The moving party may satisfy this burden by either (1) submitting affirmative evidence that negates an essential element of the nonmoving party's claim; or (2) demonstrating to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's case. Id. at 331. Once the moving party satisfies this initial burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). To do so, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

## III.  DISCUSSION

In their motions for summary judgment, the parties disagree as to both the substantive merits of the Committee's decision to deny Lyon's claim for T&PD benefits, as well as, the legal standard that should govern this Court's review of the Committee's decision.  The Defendant argues that this is not the kind of case where the company's self-interest would affect the

decision to deny Lyon's claim for pension benefits.  Therefore, the Defendant contends that the

Court should use the arbitrary and capricious standard in examining the Committee's decision.

Moreover, the Defendant asserts that the Committee's decision of denial was not arbitrary and

capricious because (1) the Committee considered all of the evidence submitted; (2) the objective

evidence did not establish that Lyons was permanently disabled; and (3) Lyons did not present

evidence to show that she was prevented from performing any occupation at Kimberly-Clark that

was commensurate with her education, training, and experience.  In contrast, Lyons argues that a

heightened arbitrary and capricious standard should apply here because the Committee allegedly

showed procedural bias in the claim denial process that was indicative of a conflict of interest.  In

addition, Lyons contends that the Committee's decision cannot withstand such scrutiny because

(1) the medical evidence demonstrates that Lyon is totally and permanently disabled, and (2)

contrary to the final decision of denial, there is EMG evidence of neurological deficits in the

administrative record as well as evidence regarding Lyon's functional capacity.  The Court will

address the arguments relating to the applicable legal standard before turning to the substantive

merits of the Committee's decision.

### A.  Relevant Legal Standard

The Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 et seq.,

provides a number of remedies to participants and beneficiaries of employee benefit plans like

the one at issue in this matter. See Massachusetts Mut. Life Ins. Co. v. Russell, 473 U.S. 134,

146 (1985) (noting that ERISA provides a "panoply of remedial devices").  For example,  §

1132(a)(1)(B) allows participants to bring suit to "recover benefits due under an ERISA plan, to

enforce rights under the terms of the plan, and to obtain a declaratory judgment of future

entitlement to benefits under the provisions of the plan contract." Firestone Tire & Rubber Co. v.

Bruch, 489 U.S. 101, 108 (1989).  Here, pursuant to § 1132(a)(1)(B), Lyon challenges the

Committee's denial of her claim for T&PD benefits.

Although ERISA provides claimants with a federal cause of action to challenge eligibility

determinations, the statutory scheme does not provide the appropriate standard of review for such

actions brought under § 1132(a)(1)(B). See id.  In addressing this precise issue, the Supreme

Court held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a

de novo standard unless the benefit plan gives the administrator or fiduciary discretionary

authority to determine eligibility for benefits or to construe the terms of the plan." Id. at 115.  In

other words, if the plan does give the administrator or fiduciary the discretion to determine

eligibility for benefits, then a denial of benefits under that plan would be subject to an "arbitrary

and capricious" or "abuse of discretion standard." See id.; Abnathya v. Hoffmann-LaRoche, Inc.,

2 F.3d 40, 45 (3d Cir. 1993).  The Supreme Court also noted that, in those situations where the

arbitrary and capricious standard applied, one factor to be considered in the analysis was whether

the administrator or fiduciary operated under a conflict of interest. Firestone, 489 U.S. at 115.

In applying the directives from Firestone, the Third Circuit has adopted a "sliding scale"

or "heightened" approach to the arbitrary and capricious standard in some circumstances. See

Pinto v. Reliance Standard Life Ins. Co., 214 F.3d 377 (2000).  Specifically, in Pinto, the Third

Circuit addressed the issue of what standard of review applies when an insurance company both

funds and administers the benefits under an ERISA plan. Id. at 378.  The Court held that in such

circumstances a "heightened" arbitrary and capricious standard applies because the insurance

company operates under a financial or structural conflict of interest that invites self-dealing. Id. at

14

378, 387-88.  That is to say, "because an insurance company pays out to beneficiaries from its own assets rather than the assets of a trust, its fiduciary role lies in perpetual conflict with its profit-making role as a business." Id. at 384 (quoting Brown v. Blue Cross & Blue Shield of Ala., 898 F.2d 1556, 1561 (11th Cir. 1990)).  This "heightened" standard is a sliding scale approach whereby the degree of scrutiny should adjust to match the degree of this inherent conflict. Id. at 379.

However, in Pinto, the Court expressly noted that the same presumed conflict of interest is not normally present in a situation where "the employer establishes a plan, ensures its liquidity, and creates an internal benefits committee vested with the discretion to interpret the plan's terms and administer benefits."Pinto, 214 F.3d at 383.  Indeed, in a prior case, the Third Circuit concluded that when an internal benefits committee within a company administers a company benefits plan, the unmodified arbitrary and capricious standard applies in the absence of specific, tangible evidence that the structural relationship had tainted the review process. See Kotrosits v. GATX Corp. Non-Contributory Pension Plan for Salaried Employees, 970 F.2d 1165, 1173 (3d Cir. 1992).  In that kind of situation, the Plaintiff has the burden to provide such tangible evidence demonstrating that the Committee's exercise of discretion has, in fact, been tainted by a financial conflict of interest. Id.  Evidence suggesting only that the payment of benefits may have a future possibility of indirect, economic consequences to the employer is insufficient to warrant a heightened standard of review. Id.

In the present case, the terms of the Pension Plan explicitly provide that an internal benefits committee has the sole discretion to interpret the Pension Plan's terms and administer benefits.  In other words, the instant matter presents the precise situation distinguished in Pinto

and addressed in <u>Kotrosits</u>, and the relevant facts before the Court do not otherwise suggest that a financial conflict of interest exists.  As mentioned above, the assets of the Pension Plan are held in trust by a Trustee.  The Trustee is authorized to use the assets in accordance with the terms of the Pension Plan. (Rec. KCC0165.)  Kimberly-Clark and its subsidiaries make contributions to the trust; however, Kimberly-Clark has no control over the assets of the Pension Plan.  Specifically, the Pension Plan provides that Kimberly-Clark has "no beneficial interest of any nature whatsoever in any contributions after such contributions have been received by the Trustee, or in the assets, income or profits of the Trust, or any part thereof." (Rec. KCC0172, § 9.2.)  Furthermore, no part of the assets of the Trust may be returned to Kimberly-Clark unless the Pension Plan is terminated and all liabilities under the Pension Plan have been satisfied. (Rec. KCC171, § 8.6.)  In light of these undisputed facts, Lyon has not set forth any specific, tangible evidence to demonstrate that the Committee's exercise of discretion was somehow tainted by a financial conflict of interest.  Therefore, the Court concludes that the current matter does not present the kind of structural conflict of interest that would justify a heightened arbitrary and capricious standard of review.

However, the Court's inquiry into the applicable standard of review does not end there.  In <u>Pinto</u>, after the Court determined that there was a structural conflict of interest that warranted a heightened standard of review, the Court then applied that heightened standard to the facts before it. <u>See</u> <u>Pinto</u>, 214 F.3d at 393.  In determining the impact that the structural conflict of interest had in the case before it, the Court noted that it "looked not only at the result-whether it is supported by reason-but at the process by which the result was achieved." <u>Id.</u>  In other words, any procedural anomalies in the process by which the plaintiff's claim for benefits was handled

16

would be evidence of the extent to which a structural conflict of interest actually affected the plaintiff's claim for benefits.  However, after Pinto, the Third Circuit interpreted this language from Pinto to have a broader meaning.  Rather than looking to procedural irregularities or bias as a means of measuring the degree of an apparent financial conflict of interest, the Third Circuit interpreted Pinto to mean that even when there is no apparent financial conflict of interest, any procedural irregularities, bias, or unfairness in the benefits determination process may be evidence of a conflict of interest sufficient to warrant a heightened arbitrary and capricious standard of review.  See Kosiba v. Merck & Co., et al., 384 F.3d 58, 68 (3d Cir. 2004).

In Kosiba, the benefits plan gave the employer the discretion to act as the administrator of that plan; however, the employer delegated claims administration to a large insurance company. Id. at 62.  Although all of the medical evidence in the record clearly supported the plaintiff's contention that she was disabled, the employer intervened in the appeals process and requested an independent examination by a physician of its own choosing. Id. at 63.  Ultimately, this independent examination contained findings that were contrary to the rest of the medical evidence in the record, yet the employer used that examination as the basis for its decision to deny the plaintiff's claim for benefits. Id.  In reviewing this denial, the Court noted that,

> This situation arguably has a quality to it that undermines the administrator's claim to the deference normally owed to plan fiduciaries. . . . We conclude that the procedural bias we have described in Epps-Malloy's appeals process warrants a moderately heightened arbitrary and capricious standard of review.  Naturally, a significantly heightened arbitrary and capricious standard of review would be warranted if Merck also acted under a financial conflict of interest, but as noted above, the record before us does not demonstrate such a conflict.  Because the district court applied an unmodified arbitrary and capricious standard of review to the defendants' actions, we will set aside the judgment and remand for a new trial on the merits under an appropriate standard of judicial review.

Id. at 67-68.

Relying upon Pinto and Kosiba, Lyon argues that a heightened standard of review should apply in the present case because the Committee allegedly demonstrated procedural bias in the manner in which it ultimately denied her claim for T&PD benefits.  In particular, Lyon alleges that it was procedurally unfair for the Committee to add new reasons for denying her claim for benefits during the special review when, at that point, Lyons had already administratively exhausted the appeals process and did not have an opportunity to cure those alleged defects. (See Pl. Mem. at 20-21.) Similarly, Lyon argues that the alleged evidentiary defects noted in the Committee's final denial are not actually defects because there is, in fact, record evidence of both (1) an EMG demonstrating neurological deficits, and (2) Lyon's functional limitations. (Id.)  In other words, Lyons argues that it was procedurally unfair for the Committee to deny Lyon's claim for benefits based on an alleged lack of EMG evidence or an FCE when (1) the Committee never previously indicated that such evidence was necessary or would somehow be determinative of the benefits decision, and (2) the record, in any event, contained both objective evidence of neurological deficits as well as medical findings regarding Lyon's functional capacity.  The Court notes that these facts may be indicative of some procedural bias that might justify a heightened standard of review. See Doyle v. Nationwide Ins. Companies & Affiliates Employee Health Care Plan, 240 F. Supp. 2d 328,  342-43 (E.D. Pa. 2003) (finding that administrator's failure to confront contrary medical evidence in the record warranted a slightly heightened arbitrary and capricious standard of review); Holzschuh v. UNUM Life Ins. Co. of Am., No. 03-1035, 2002 WL 1609983, at *6 (E.D. Pa. Jul. 18, 2002) (finding that "significant skepticism" was warranted where, among other things, the claims administrator reached conclusions that were unsupported

18

by the record); <u>Cohen v. Standard Ins. Co.</u>, 155 F. Supp. 2d 346, 352-53 (E.D. Pa. 2001) (finding

that conflict existed justifying heightened review where administrator adhered to conclusions in

the face of credible contradictory evidence); <u>see also</u> <u>Schleibaum v. Kmart Corp.</u>, 153 F.3d 496,

499-500 (7th Cir. 1998) (noting that claims administrator committed procedural error when it

failed to provide the ultimate reason for its denial at a time when the claimant could have done

something about it and/or submitted additional information to perfect his claim).  However, for

the reasons discussed below, the Court finds that the Committee's final decision would

nevertheless fail even under the more deferential, unmodified arbitrary and capricious standard.

### B.  Application of Arbitrary and Capricious Standard

In the Committee's final denial of Lyon's claim for T&PD benefits, the Committee

provided two specific reasons for the denial.  First, the Committee noted that "the medical

records do not include objective evidence of neurological compromise, such as EMG or nerve

conduction studies." (Rec. KCC0002.)  Indeed, the Committee reiterated this reason by

concluding that "there is no evidence of neurological deficits with regard to Ms. Lyon's back

pain." (<u>Id.</u>)  Second, the Committee explained that "no functional capacity evaluation" had been

performed. (<u>Id.</u>)  After providing these two specific reasons for its final denial of Lyon's claim,

the Committee concluded that,

> Based on the information presented to the Committee, the Committee was unable
> to determine that the termination of Ms. Lyon's employment was because of her
> having become Totally and Permanently Disabled, nor that her condition is
> permanent and prevents her from engaging in any occupation with Kimberly-
> Clark commensurate with her education, training and experience.

(Rec. KCC0002-03.)

In applying the arbitrary and capricious standard, the Court may overturn the

Committee's final decision only if it was "without reason, unsupported by substantial evidence or erroneous as a matter of law." Abnathya, 2 F.3d at 45 (quoting Adamo v. Anchor Hocking Corp., 730 F. Supp. 490, 500 (W.D. Pa. 1989)); Fahringer v. Paul Revere Ins. Co., 317 F. Supp. 2d 504, 510 (D.N.J. 2003). Application of this standard to each of the stated reasons for the Committee's final denial of Lyon's claim demonstrates that the Committee's decision was arbitrary and capricious.

### 1. Evidence of Neurological Deficits

The Committee's conclusion that there was "no evidence of neurological deficits" in the administrative record is both unreasonable and unsupported by substantial evidence in the record. Perhaps most significantly, the Committee's statement regarding evidence of neurological compromise is factually inaccurate. See Holzschuh, 2002 WL 1609983, *5 (finding administrator's decision to be arbitrary and capricious where the basis for the decision was either "simply wrong" or clearly contradicted by the record). Although the record does not contain a *lab report* of an EMG or nerve conduction study, the administrative record does contain several medical reports which establish not only that an EMG was performed, but also that the EMG revealed a neurological deficit relating to Lyon's back pain. See Irelan v. Barnhart, 243 F. Supp. 2d 268, 278 (E.D. Pa. 2003) (suggesting that medical reports constitute objective medical evidence if they reference objective medical testing or diagnostic test results); Weber v. Massanari, 156 F. Supp. 2d 475, 484 (E.D. Pa. 2001) (referring to physician and hospital reports as objective medical evidence). For instance, in both of Aetna's independent evaluations dated April 22, 2002 and October 17, 2002, Aetna reported that Lyon received treatment in December 1999 for constant lower back pain. In turn, both of Aetna's reports indicate that, at that time,

"[a]n EMG completed demonstrated L4-L5 radiculopathy." (Rec. KCC0036, KCC0114.)

Likewise, Dr. Cataldo's report states that "On December 13, 1999 an EMG was performed and

revealed L4 greater than L5 radiculitis." (Rec. KCC0010.)  All of these documents in the

administrative record demonstrate that it was erroneous for the Committee to conclude that there

was no objective record evidence of a neurological deficit relating to Lyon's back pain.

Although the Defendant attempts to persuade the Court that the Committee's conclusion

regarding evidence of neurological deficits is reasonable, the Court finds these arguments

unavailing.  First, the Defendant appears to argue that it was somehow fatal to Lyon's claim that

there was no specific lab report of an EMG or nerve conduction study in the record.  However,

the Defendant does not point out any provision in the Pension Plan specifically requiring a lab

report instead of other objective medical evidence reiterating the findings of the EMG study. See

Mitchell v. Eastman Kodak Co., 113 F.3d 433, 443 (3d Cir. 1997) (finding it arbitrary and

capricious to require the claimant to submit clinical evidence of the etiology of his allegedly

disabling symptoms when the Plan did not impose such a requirement); Holzschuh, 2002 WL

1609983, at *8 (noting that "it is arbitrary and capricious for an administrator to require a

claimant to satisfy conditions that are not part of a policy").  Likewise, the Court has not found

any such requirement.  In any event, despite the Committee's conclusion to the contrary, there is

objective medical evidence in the record establishing that an EMG test was performed and

demonstrated that Lyon had neurological deficits.

Second, the Defendant argues that (1) the Committee had no active duty to search outside

the administrative record for evidence relating to the Plaintiff's claim, and further, that (2) the

Court's review is limited to the documentation in the administrative record that was before the

Committee when it made its final decision. (See Def. Opp. at 8-10; Def. Reply 3-5.) Although

the Defendant is correct in noting that the relevant evidence in this case is limited to the

administrative record, see Miller, 113 F.3d at 440, that argument is somewhat misplaced in this

context. As set forth above, the administrative record before the Committee actually contained

medical evidence of neurological deficits, which the Committee inaccurately claimed was

missing. In other words, the Court is not suggesting that the Committee would have any duty to

look outside the record for medical evidence regarding whether Lyon's back pain had a

neurological impact. Moreover, the Court is not relying upon the new evidence submitted by

Lyons along with her motion papers. To the contrary, there was evidence in the administrative

record regarding Lyon's EMG results at the time the Committee issued its ultimate decision of

denial.

Third, the Defendant argues that the language in the SSA decision does not clearly

indicate what, if any, tests were performed to support the ALJ's discussion of Lyon's

neurological compromise. (Def. Reply at 5.) However, as previously mentioned, even putting

aside the SSA decision, there are other documents in the record that specifically report the EMG

results. Moreover, although the SSA determination is not automatically binding on the

Committee's decision regarding pension benefits, it is at least some evidence to support the

conclusion that Lyon's back pain had a neurological component. See Stith v. Prudential Ins. Co.

of Am., 356 F. Supp. 2d 431, 440 n.4 (D.N.J. 2005) (citing Marx v. Meridian Bancorp Inc., 32

Fed. Appx. 645 (3d Cir. 2002)) (noting that a Social Security Administration finding may be a

factor for consideration by a plan administrator when considering claims for disability benefits).

Indeed, among other things, the administrative law judge noted in the SSA decision that "clinical

and physiologic finds were consistent with . . . a right C67 radiculopathy" and that at least one of Lyon's doctors diagnosed her with "right C6-7 radiculopathy." (Rec. KCC0059.)

Overall, on these facts, the Court concludes that, to the extent the Committee's final decision to deny Lyon's claim for benefits was grounded on an alleged lack of record evidence demonstrated a neurological deficit, that decision was arbitrary and capricious because it was unreasonable, contrary to the objective medical evidence in the record, and simply wrong as a factual matter.

### 2.  Functional Limitations

The Committee's final denial of Lyon's claim for T&PD benefits also implies that one of the reasons for the denial is the lack of a functional capacity assessment ("FCE") in the administrative record. (Rec. KCC0002.)  However, the terms of the Pension Plan do not suggest that the lack of an FCE would necessarily be fatal to Lyon's claim, nor did the Committee clearly communicate any such necessity to Lyon prior to the final denial of her claim.[5]  Instead, the relevant inquiry under the Pension Plan is determining whether "the termination of Ms. Lyon's employment was because of her becoming totally and permanently disabled." (Rec. KCC0094-95, § 2.5.)  In other words, under the terms of the Pension Plan, it is not absolutely necessary for the Plaintiff to submit an FCE, as long as there is other evidence in the record sufficient to show that Lyon's impairments prevented her from performing any occupation at Kimberly-Clark commensurate with her education, training, and experience. (See Rec. KCC0181, § 10.1(w)).

In this regard, the Committee's final decision completely ignores the multiple physician

---

[5]After her first appeal, the Committee merely noted that if Lyons wanted to re-apply for benefits, "it would be helpful" if she submitted an FCE. (Rec. KCC0031.)

reports in the record that provide detailed and consistent descriptions of Lyon's functional capabilities. A review of the relevant evidence demonstrates that the record contains numerous findings as to Lyon's functional limitations, and furthermore, that all of these findings indicate that Lyon is permanently incapable of working, even in jobs that require only minimal, sedentary activity.

First, in his Statement of Disability, Dr. Rogers addressed many of Lyon's impairments. He indicated that Lyon could only sit, stand, walk, and/or drive for less than thirty minutes consecutively. (Rec. KCC0117.) He also noted that she was taking "long-acting opiates" to control her pain and that she had to "use a cane to ambulate." (Id.) Moreover, he determined that Lyon could not perform tasks requiring frequent grasping, pushing/pulling, and fine manipulation, and she was likewise frequently restricted in her ability to kneel, climb, twist, and lift, and occasionally limited in her ability to bend and reach. (Rec. KCC0118.) Overall, Dr. Rogers opined that Lyon's physical impairments were severe and permanent, such that Lyon could not perform minimal or sedentary activity, even with job modifications. (Rec. KCC0118-19.)

Second, in a similar Physician's Statement of Disability dated August 8, 2002, Dr. Testaiuti noted some of Lyon's physical restrictions. For instance, he determined that she could only sit, stand, walk, or drive for a maximum of thirty minutes. (Rec. KCC0069.) He also noted that she used a cane to ambulate and her impairments prevented her from performing activities that required bending, kneeling, climbing, twisting, and lifting. (See Pl. Exhibit N.) In addition, he noted that she was restricted from using her feet for repetitive movements. (Id.) Overall, Dr. Testaiuti found that Lyon's physical capacity was severely and permanently limited, such that she

24

could not perform minimal sedentary activity, even with job modifications. (Id.)  Although Dr.
Testaiuti noted that Lyon was a candidate for rehabilitation at that time, he subsequently
submitted a report which determined that Lyon "would not require any further surgery" and that
"she ha[d] reached maximum medical improvement." (Id.; Rec. KCC0018-19.).

Third, in another Physician's Statement of Disability dated July 31, 2002, Dr. Ann Miller
reported similar limitations on Lyon's physical capacity.  She found that Lyon could only sit,
stand, walk, or bend for less than thirty minutes consecutively and indicated that Lyon required a
cane to ambulate and took long-acting opiates to control pain. (Rec. KCC0090.)  She also noted
that Lyon was restricted from using her hands and feet for repetitive tasks, and further, that Lyon
should not perform activities requiring her to bend, kneel, climb, twist, reach, and lift. (See Pl.
Exh. O.)  Ultimately, like Dr. Rogers and Dr. Testaiuti, Dr. Miller concluded that Lyon was
severely and permanently impaired, such that she was incapable of performing minimal sedentary
activity, even with job modifications. (Id.) Although she thought at the time that Lyon was still a
candidate for rehabilitation, she later submitted an additional report which clarified her position
by stating that although Lyon could potentially have future surgeries, "even with possible rehab"
Lyons would not be able to work "even a part-time job on a regular basis." (Id.; Rec. KCC0020-
21.)

Fourth, Dr. Cataldo submitted a report wherein he recorded that Lyon had significant
restrictions in terms of her range of motion in her arms, legs, and torso.  (See Rec. KCC0009-17.)
Based upon these observations and his review of Lyon's medical records, Dr. Cataldo concluded
that his "estimate of disability is based upon demonstrable objective medical evidence" and
"restricts the function" of Lyon's back, shoulders, hands, legs, and feet "to a material degree."

25

(See Rec. KCC0016-17.)  In sum, Dr. Cataldo reported that Lyon "has been rendered totally and permanently disabled." (Rec. KCC0017.)

In light of all of these consistent findings establishing Lyon's severe and permanent functional limitations, the Court finds that the Committee's decision to deny Lyon's claim for benefits based on a lack of an FCE is unreasonable and unsupported by evidence in the record. Reports from Dr. Cataldo, Dr. Rogers, Dr. Testaiuti, and Dr. Miller all address Lyon's functional capacity and all reach the same conclusion–namely, that she is unable to work even at the most sedentary level, and even with job modifications.  Therefore, the Committee's conclusion, apparently based on a lack of an FCE, that it could not determine whether Lyon's impairments prevented her from working at Kimberly-Clark is belied by virtually all of the medical evidence in the record.  Simply put, the Committee's argument regarding the FCE is arbitrary and capricious because (1) it implies a requirement not set forth in the Pension Plan (i.e. that a lack of an FCE is necessarily fatal to a claim for benefits), and (2) it disregards overwhelming evidence of functional limitations in record. See Carney v. Int'l Brotherhood of Elec. Workers Local Union 98 Pension, 66 Fed. Appx. 381, 386 (3d Cir. 2003) (finding that denial of benefits was arbitrary and capricious where, among other things, it violated terms of the benefits plan and was unsupported by record evidence); Stith, 356 F. Supp. 2d at 439-40 (finding that it was arbitrary and capricious for the administrator to disregard the weight of medical authority establishing the plaintiff's disability); Dorsey v. Provident Life & Acc. Ins. Co., 167 F. Supp. 2d 846, 856-57 (E.D. Pa. 2001) (finding that administrator's denial of plaintiff's claim for benefits was arbitrary and capricious where the administrator's decision disregarded substantial evidence of disability in the record).

26

<u>3.  Record Evidence Regarding the Permanence of Lyon's Disability</u>

For similar reasons, the Court finds that the Committee's conclusion regarding the

permanence of Lyon's disability is unsupported and contrary to the medical evidence in the

record.  As mentioned above, the Committee's final denial of Lyon's claim ultimately concludes

that "the Committee was unable to determine that the termination of Ms. Lyon's employment

was because of her having become Totally and Permanently Disabled, nor that her condition is

permanent . . . ."  (Rec. KCC0003.)  There is no clear explanation of this finding in the final

denial letter, other than the Committee's statements that there was no evidence of neurological

compromise and no FCE. (Rec. KCC0002-03.)  In the briefing on this issue, however, the

Defendant repeatedly argues that the record did not establish the permanence of Lyon's disability

because there were discrepancies in the medical opinions on the issue, particularly with respect to

the potential for future surgeries. (<u>See</u> Def. Mem. at 20, Def. Reply at 3.)

However, a close review of the medical opinions before the Committee during its final

review demonstrates that there really was no discrepancy of opinion regarding the permanence of

Lyon's disability.  The Defendant repeatedly points out that Dr. Miller noted that "further

surgeries are probable in the future."[6] (<u>See</u> Def. Mem. at 20, Def. Reply at 3; Rec. KCC0020.)

However, the Defendant fails to note that, in the very next paragraph, Dr. Miller explicitly states

that "I do not believe that even with possible rehab that she [Lyon] could be able to work at even

a part-time job on a regular basis due to her many medical problems." (Rec. KCC0021.)  In other

---

[6] Aetna's reports also conclude that Lyon's condition was not permanent due to the fact
that there was a possibility for further surgeries. (<u>See</u> Rec. KCC0038, KCC0115.)  However, like
the Defendant, Aetna does not consider the fact that even the doctor who anticipated further
surgery likewise stated that any rehabilitative effect that Lyon might experience would not be so
great as to change her inability to work.

words, Dr. Miller made clear that any possible rehabilitation that Lyon could be expected to experience in the future would not alter the permanent effect that her condition had on her ability to work.  Similarly, Dr. Testaiuti's October 1, 2003 report indicated that (1) Lyon had reached maximum medical improvement from a neurological standpoint, and (2) that any subsequent rehabilitation would not result in Lyon being able to return to work at Kimberly-Clark Corporation. (Rec. KCC0019.)  Likewise, after examining Lyon and reviewing her medical history, Dr. Cataldo concluded that Lyon had been "rendered totally and permanently disabled." In other words, it appears that all of the physicians who have made findings as to the permanence of Lyon's condition have concluded that she is permanently disabled such that she cannot work even at a minimal, sedentary level.  Accordingly, the Court finds that the Committee's unexplained, contrary conclusion is arbitrary and capricious because it is unsupported by substantial evidence in the record.  See Abnathya, 2 F.3d at 45.

## IV.  CONCLUSION

For the foregoing reasons, the Court finds that Lyon has met her burden of showing that the Committee's final denial of her claim for T&PD pension benefits was arbitrary and capricious.  Accordingly, the Court will grant Lyon's motion for summary judgment with respect to her claim for T&PD pension benefits and will deny Defendant's motion for summary judgment.  The accompanying Order shall issue today.


Dated: September 5, 2006                          s/ Robert B. Kugler
                                                  ROBERT B. KUGLER
                                                  United States District Judge

28